OPINION
{¶ 1} Defendant-appellant Thelma Dunaway appeals from a summary judgment rendered against her and in favor of plaintiff-appellee Douglas Mays and third-party defendants-appellees John Patterson and John Legate. Dunaway also appeals from the denial of her request for sanctions for failure to comply with discovery and orders of the court by Mays, Patterson and Legate. Dunaway contends that the trial court erred in rendering summary judgment in favor of Mays, because the provision in the contract between Mays and Dunaway for the sale of her property, requiring any modifications of the contract to be in writing signed by both parties, is unambiguous, and the contract must therefore be enforced as written, and the closing date could not be extended by applying an exception to the Statute of Frauds. In the alternative, Dunaway contends that an exception to the Statute of Frauds does not exist to extend the closing date, because the furtherance of a rezoning effort was insufficient to constitute part performance.
 {¶ 2} We conclude that Mays failed to establish that the requirements of the Statute of Frauds were met and failed to establish part performance as an exception to the Statute of Frauds. Therefore, there was no enforceable contract to extend the closing date, which expired without either a closing or a tender of performance by Mays. Thus, we conclude that the trial court erred in rendering summary judgment in favor of Mays, the summary judgment is reversed, and this cause is remanded for further proceedings on Dunaway's counterclaims against Mays.
 {¶ 3} Dunaway also contends that the trial court erred when it granted summary judgment in favor of Patterson and Legate, because there is a genuine issue of material fact whether Patterson and Legate were partners with Mays in the purchase of Dunaway's property. We conclude that the depositions of Dunaway, Mays, Legate, and Patterson, and the affidavits of Mays, Legate, and Patterson, as well as the answers by Legate and Patterson to Dunaway's interrogatories, demonstrate that a genuine issue of material fact exists whether a partnership existed between Mays, Patterson and Legate regarding the purchase of Dunaway's farm. Therefore, the trial court erred in granting summary judgment in favor of Patterson and Legate, and this cause is remanded for further proceedings on Dunaway's third-party claims against Patterson and Legate.
 {¶ 4} Dunaway contends that the trial court erred in its failure to award reasonable expenses or to make a finding that non-compliance with orders by the trial court compelling discovery was substantially justified. We conclude that because the trial court failed to make an express finding that the failure to comply was substantially justified or that other circumstances would make an award unjust, the trial court erred by not awarding Dunaway reasonable expenses. This cause is remanded for consideration of Dunaway's request for reasonable expenses, including attorney's fees, as a result of Mays, Patterson, and Legate's failure to comply.
 {¶ 5} Dunaway contends that she is also entitled to recover expenses for Mays's and Legate's failure to attend mediation. We conclude that the trial court did not err in overruling Dunaway's motion for sanctions, pursuant to Montgomery County Local Rule 2.39, for the failure of Mays and Legate to attend mediation.
 {¶ 6} Dunaway contends that Mays, Patterson, and Legate should be precluded from asserting the attorney-client privilege regarding the testimony of John Koverman, the attorney involved in the zoning case, because the trial court's ruling on September 25, 2002 is dispositive on that issue. We conclude that because the trial court ruled in favor of Dunaway, Dunaway does not assert any error to her prejudice by the trial court. Therefore, the issue of attorney-client privilege is not properly before us.
 {¶ 7} Accordingly, the judgment of the trial court is reversed in part and affirmed in part. This cause is remanded for further proceedings on Dunaway's counterclaims against Mays and on Dunaway's third-party claims against Patterson and Legate, as well as to consider Dunaway's request for reasonable expenses, including attorney's fees, as a result of Mays, Patterson, and Legate's failure to comply with discovery orders.
 I {¶ 8} In December, 1995, Thelma Dunaway and Douglas Mays entered into a contract for the sale of Dunaway's 239 acres of real estate in Miami Township for $900,000. The contract provided a closing date for the sale of April 2, 1996. The closing date was later extended in writing to January 2, 1997. The closing date was then again extended, in writing, to September 15, 1997.
 {¶ 9} The contract provided that favorable zoning was a condition precedent to the performance of the contract. After the Board of Trustees of Miami Township, Montgomery County, denied an application for the rezoning of the property, Mays and Dunaway filed a complaint for declaratory judgment and injunctive relief against the Board in July, 1997. The complaint was signed by Dunaway and acknowledged that Mays had an interest in the property. A magistrate dismissed the complaint in its entirety. The trial court overruled objections to the magistrate's decision, and adopted it as the judgment of the court. We affirmed that judgment in Mays v. Board of Trustees of Miami Twp., Montgomery App. No. 18997, 2002-Ohio-3303.
 {¶ 10} In August, 2000, while the zoning case was pending, Dunaway entered into a purchase agreement with Glenn and Barbara Zink for the sale of the property. Thereafter, Mays filed an affidavit with the Montgomery County Recorder's Office to place of record his interest in the property. Mays also brought this action against Dunaway seeking specific performance of the contract. The Zinks then terminated their contract with Dunaway.
 {¶ 11} Dunaway filed an answer to Mays's complaint that included counterclaims against Mays for slander of title, tortious interference with a business relationship and malicious prosecution. Mays amended his complaint to add a claim against the Zinks for tortious interference with a contract. The Zinks were later dismissed, when they terminated their contract with Dunaway. Dunaway then moved for summary judgment for specific performance of the contract. The trial court overruled Dunaway's motion for summary judgment.
 {¶ 12} Dunaway later amended her answer and filed a third-party complaint against John Patterson and John Legate, alleging that Mays, Patterson, and Legate had a financial interest in the contract and had acted in concert as joint venturers, partners or agents for each other in the proposed purchase of the property. Dunaway made a counterclaim and third-party claim for slander of title, tortious interference with a business relationship, malicious prosecution, and specific performance against Mays, Patterson, and Legate.
 {¶ 13} Thereafter, Mays, Patterson, and Legate filed motions for summary judgment, and Dunaway filed a motion for partial summary judgment. The trial court granted Mays, Patterson, and Legate's motions for summary judgment and denied Dunaway's motion for partial summary judgment. The trial court found that a partnership had not been established between Legate, Patterson, and Mays, and that Patterson and Legate were not the proper parties to be subject to Dunaway's claims. The trial court further found that Dunaway's conduct in signing the zoning complaint and in participating in the rezoning lawsuit extended the contract past the September 15, 1997 closing date, because her conduct implicitly represented that she would stand by the contract and not use the Statute of Frauds to escape her contractual obligation. The trial court found that there was detrimental reliance, justifying an exception to the Statute of Frauds, in the continued effort to secure rezoning of the property. Therefore, the trial court found that Dunaway failed to establish the elements of her counterclaims, because the contract was still in existence on the filing of the affidavit by Mays in August, 2000. The trial court also found that Dunaway failed to establish her claim for specific performance, because the failure of rezoning was the basis for Mays's termination of the contract. From the summary judgment rendered against her, Dunaway appeals.
 II {¶ 14} Dunaway's First and Second Assignments of Error are as follows:
 {¶ 15} "The trial court erred by denying Mrs. Dunaway's motion for partial summary judgment which sought to have the contract interpreted by the specific written terms contained therein.
 {¶ 16} "The trial court erred by granting mays' motion for summary judgment."
 {¶ 17} Dunaway's First and Second Assignments of Error contend that the trial court erred in rendering summary judgment against Dunaway upon her claims and in rendering summary judgment in favor of Mays. We review the appropriateness of summary judgment de novo and follow the standards set forth in Civ.R. 56. Koos v. Cent. Ohio Cellular, Inc. (1994),94 Ohio App.3d 579, 588, 641 N.E.2d 265. "Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor." Zivich v.Mentor Soccer Club, Inc., 82 Ohio St.3d 367, 1998-Ohio-389, 696 N.E.2d 201, at ¶ 3 (citation omitted). "`If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined.'" Fortune v. Fortune, Greene App. No. 90-CA-96, 1991 WL 70721, at *1 (citation omitted). With these standards in mind, we now address Dunaway's contentions.
 {¶ 18} The contract between Dunaway and Mays for the sale of Dunaway's 239 acres in Miami Township provides, in pertinent part, that "[a]ny subsequent conditions, representations, warranties or agreements shall not be valid and binding upon the parties unless in writing signed by both parties." Dunaway contends that because this contract provision, requiring any modifications of the contract to be in writing signed by both parties, is unambiguous, the contract must be enforced as written, and cannot be extended by applying an exception to the Statute of Frauds. In the alternative, Dunaway contends that an exception to the Statute of Frauds does not exist, because the continued effort to secure rezoning was insufficient to constitute part performance.
 {¶ 19} R.C. 1335.05, the Statute of Frauds, requires a contract for the sale of land to be in writing. R.C. 1335.05 provides, in pertinent part, that "[n]o action shall be brought whereby to charge the defendant, . . . upon a contract or sale of lands, tenements, or hereditaments, or interest in or concerning them, . . . unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized." "If a contract falling under the statute of frauds is not properly memorialized in a signed writing, the effect of the statute is to render an otherwise valid contract unenforceable." Beavercreek Assoc. v. Larry Stein RealtyCo., Montgomery App. No. 14950, 1995 WL 516469, at *3.
 {¶ 20} A contract for the sale of land that is not in a signed writing is nevertheless enforceable if it meets an exception to the Statute of Frauds. Id. "Ohio courts have consistently recognized the doctrine of part performance as an exception to the statute of frauds. When applicable, this doctrine operates to remove a contract from the operation of the statute of frauds. In order to remove a contract from the statute of frauds pursuant to the doctrine of part performance, the party that is relying on the agreement must have undertaken `unequivocal acts' . . . which are exclusively referable to the agreement and which have changed his position to his detriment and make it impossible or impractical to place the parties in statu quo. Thus, a party seeking to establish part performance must demonstrate that he has performed acts in exclusive reliance on the oral contract, and that such acts have changed his position to his prejudice." Id. (internal citations omitted). The plaintiff must show that the reliance was reasonable. Fortune, 1991 WL 70721, at *3 (citation omitted).
 {¶ 21} "Generally, in cases involving real estate contracts, courts require acts such as possession, payment of consideration, and improvements on the land in order to find part performance of the contract." Beavercreek, 1995 WL 516469, at * 3. "While it has been held that a single criterion, standing alone, is not sufficient evidence to establish part performance and thereby warrant the removal of the oral agreement from the statute of frauds, it is unclear exactly what combination of criteria is sufficient. However, it is clear that a party who demonstrates all three has established part performance." Geiger v.Geiger, Montgomery App. No. 13841, 1993 WL 476247, at *4 (internal citation omitted).
 {¶ 22} It is undisputed that there is no written contract extending the contract for the sale of Dunaway's real estate to Mays past the September 15, 1997 closing date. Mays argues that the partial performance exception to the Statute of Frauds applies, because detrimental reliance existed based on the continued efforts to secure rezoning of the property. Thus, Mays contends that the contract was extended until a decision was reached in the zoning case. We disagree.
 {¶ 23} The record shows, and it is undisputed, that Mays did not possess the property, and that Mays did not improve the property. It is also undisputed that Mays did not make a monetary payment of consideration. Rather, Mays argues that the performance of services is consideration, and that his pursuit of the rezoning constituted performance of services. Mays relies on Brannan v. Fowler (1995),100 Ohio App.3d 577, 584, 654 N.E.2d 434, which provides that "[g]enerally, the performance of services as consideration of a promise to convey land is insufficient to justify enforcement of an oral agreement. However, services may be sufficient partial performance if the services are such that they cannot be readily valued in money."
 {¶ 24} Mays alleges in his complaint that he "expended thousands of dollars in reliance upon said [oral] agreement," and Mays stated in his affidavit in support of summary judgment that "[h]e changed his position in such reliance to his prejudice by signing a contract with an attorney to pay attorney fees, by expending and incurring several thousands of dollars in engineering costs and attorney fees, and further by pursuing rezoning of the property. . . ." Thus, Mays' pursuit of the rezoning is not a service that cannot be readily valued in money. In addition, as stated above, "it has been held that a single criterion, standing alone, is not sufficient evidence to establish part performance and thereby warrant the removal of the oral agreement from the statute of frauds. . . ." Geiger, 1993 WL 476247, at *4 (citation omitted). We conclude that Mays has failed to establish part performance.
 {¶ 25} We note, also, that Mays's effort to secure rezoning, while it might have benefitted Dunaway, had it been successful, was primarily for his benefit. Mays was purchasing the property, so the zoning of the property was of vital interest to him, as the prospective future owner. The condition of the contract, that the property must be rezoned, was doubtless intended for the protection of Mays, not Dunaway, since Dunaway would not likely care how the property was zoned once it was sold and she had been paid, but Mays would obviously be interested in the future zoning of the property. A purchaser's expenditures to further his own interests may support a claim of reliance estoppel under particular circumstances, but will not ordinarily be deemed to constitute either part of the consideration for the purchase, or partial performance of the purchase contract.
 {¶ 26} Mays further argues that "[m]ore compelling . . . is the frank and obvious conclusion that Thelma Dunaway agreed in writing that the contract existed and that Doug Mays maintained an interest in the property in signing the Complaint and continuing to participate in the rezoning effort." The record shows that the zoning complaint, signed by Dunaway, alleged that Dunaway was the owner of the 239-acre tract located in Miami Township, and that Mays had entered into a contract to purchase the property and had an equitable and legal interest in the property. However, at the time Dunaway signed the zoning complaint, in July, 1997, Mays did have an interest in the property, because it was prior to the closing date, September 15, 1997. Dunaway also testified in her deposition that she called Mays on September 15, 1997, and informed him that his contract for the property had lapsed. Mays testified in his deposition that he did not remember this conversation, but he also did not deny the conversation. Mays also acknowledged in his testimony that modifications to the contract were to be in writing, pursuant to the contract, and the record shows that the first two extensions of the closing date were in a signed writing. We conclude that Mays failed to establish that a reasonable person would have relied upon Dunaway's co-operation with the rezoning litigation, as a co-plaintiff, as an implicit representation that the contract closing date, which she had twice extended in writing, would be ignored.
 {¶ 27} Because Mays failed to establish that the requirements of the Statute of Frauds were met and failed to establish part performance as an exception to the Statute of Frauds, an enforceable contract to extend the closing date past September 15, 1997, did not exist. Therefore, we conclude that the trial court erred in rendering summary judgment against Dunaway and in favor of Mays. This cause will be remanded for proceedings on Dunaway's counterclaims against Mays.
 {¶ 28} Dunaway's First and Second Assignments of Error are sustained.
 III {¶ 29} "The court erred when it granted summary judgment to patterson and legate."
 {¶ 30} Dunaway contends that the trial court erred when it rendered summary judgment in favor of Patterson and Legate, because there is a genuine issue of material fact whether Patterson and Legate were partners with Mays in the purchase of Dunaway's property.
 {¶ 31} When a motion for summary judgment is before the court, the moving party bears the initial burden of demonstrating that no genuine issue of material fact exists on the essential elements of the nonmoving party's claims. Dresher v. Burt, 75 Ohio St.3d 280, 293, 1996-Ohio-107,662 N.E.2d 264. The moving party's initial burden is not discharged by making merely conclusory assertions, but must be based on some evidence demonstrating the nonmoving party has no evidence to support its claims.Id. Summary judgment must be denied if the moving party fails to satisfy its initial burden. Id. If the moving party satisfies its initial burden, the nonmoving party has a reciprocal burden of setting forth specific facts demonstrating the existence of a genuine issue of material fact precluding summary judgment. Id. The nonmoving party may not rest on mere allegations or denials of his pleadings. Id. Summary judgment is appropriate if the nonmoving party fails to satisfy this burden. Id.
 {¶ 32} R.C. 1775.05(A) defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit. . . ." "The Revised Code does not require a written agreement in order for a partnership to exist, and there is no bright line rule for determining the existence of a partnership." Weithman v. Weithman,
Crawford App. No. 3-02-08, 2002-Ohio-3400, at ¶ 15. Although there is no bright line rule, R.C. 1775.06(D) provides that "[t]he receipt by a person of a share of the profits of a business is prima-facie evidence that he is a partner in the business."
 {¶ 33} In addition, "when a person, . . . by conduct, represents himself, or consents to another representing him to anyone, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership. . . ." R.C. 1775.15(A). "When a partnership liability results, he is liable as though he were an actual member of the partnership. When no partnership liability results, he is liable jointly with the other persons, if any, so consenting to the contract or representation as to incur liability, otherwise separately. When a person has been thus represented to be a partner in an existing partnership, or with one or more persons not actual partners, he is an agent of the persons consenting to such representation to bind them to the same extent and in the same manner as though he were a partner in fact, with respect to persons who rely upon the representation. Where all the members of the existing partnership consent to the representation, a partnership act or obligation results; but in all other cases it is the joint act or obligation of the person acting and the persons consenting to the representation." R.C. 1775.15(A)(1), (2), (B).
 {¶ 34} Where a partnership does exist and "loss or injury is caused to any person not a partner in the partnership or any penalty is incurred, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his partners, the partnership is liable therefor to the same extent as the partner so acting or omitting to act." R.C. 1775.12. All partners are jointly and severally liable for the wrongful acts chargeable to a partnership under R.C. 1775.12. R.C. 1775.14(A)(1).
 {¶ 35} The record shows conflicting evidence regarding the existence of a partnership between Mays, Patterson and Legate concerning the purchase of Dunaway's property. Dunaway testified in her deposition that Mays told her he had partners, and that she had received a $10,000 check from Patterson and Legate to extend the closing date in the contract. Dunaway also testified that she later met with Mays, Legate and Patterson to extend the contract again, when Dunaway did agree to extend the contract for no payment of money.
 {¶ 36} Mays's affidavit, submitted in support of his motion for summary judgment, states as follows:
 {¶ 37} "3. That at no time did the undersigned have a partnership relationship with J.M. Patterson or John Legate as it pertained to the purchase of the subject real estate, the filing of the subject Affidavit, or in any other fashion which creates an interest of Mr. Patterson and Mr. Legate in the subject real estate;
 {¶ 38} "4. That Douglas M. Mays solely approved and signed the Affidavit filed in the Montgomery County Recorders Office concerning the subject transaction;
 {¶ 39} "5. That at no time did Mr. Patterson or Mr. Legate enter into a partnership agreement concerning purchase of the real estate with the undersigned[;]
 {¶ 40} "6. That the name of `Jamaica Development, Ltd.' was to be utilized to establish a limited liability company to pursue development of the subject property if Thelma Dunaway and I were successful in rezoning and I obtained title to the real estate, however, any use of the name was in advance of structuring any such entity and was primarily used as a label for the project by me;
 {¶ 41} "7. That Mr. Legate and Mr. Patterson contemplated involvement in the development of the property if I acquired it, and toward that end, both monitored activities and may have simply paid expenses from time to time during the expensive rezoning process. . . ."
 {¶ 42} In another affidavit in support of his motion for summary judgment, Mays avers that "[a]t no time did the undersigned have any partners in the effort to rezone the property. . . ."
 {¶ 43} Mays's affidavits are inconsistent with his deposition testimony, in which he stated as follows:
 {¶ 44} "A. Well, Mrs. Dunaway said she wanted to sell her farm and wanted to know if we'd heard anything. And naturally we hadn't heard much, and wanted to know if we would be interested in buying her farm with no contingencies, no zoning.
 {¶ 45} "And I told her I had partners, that I couldn't answer until I talked to the other partners. And the only reason I know this, that's when I did go to John Patterson's house to see if we could get ahold of John Legate to see what we could or couldn't do.
 {¶ 46} "So when I got there I think I was at John Patterson's house, and we called Mrs. Dunaway and asked her if we could buy the property without zoning for less than the original price."
 {¶ 47} John Legate testified in his deposition as follows:
 {¶ 48} "Q. * * * * [Y]ou heard from J.M. [John Patterson] that Doug Mays had this contract to buy the Dunaway farm —
 {¶ 49} "A. Yes.
 {¶ 50} "Q. — he told you.
 {¶ 51} "A. Okay.
 {¶ 52} "Q. Now how did you happen to be talking about that? Did it involve you or —
 {¶ 53} "A.J.M. I think asked me did I want to go in on some houses and I said whereabouts. And he said Dunaway farm and I said well, I don't know whether I can afford it or not.
 {¶ 54} "And he said well, she'll give it to us for so much down and then we go by section if we can get it zoned.
 {¶ 55} "Q. Uh-huh.
 {¶ 56} "A. And I think now that it come up that if we got so many lots, it would cost approximately $140,000 and if they got it zoned, J.M. and I was going to take half of the 140,000 to pay Thelma Dunaway. I think I'm saying it right there.
 {¶ 57} "Q. I'm a little unclear about — this is —
 {¶ 58} "A. 140,000 down.
 {¶ 59} "Q. Oh, okay. So you and J.M. would pay half the down?
 {¶ 60} "A. Half the 140,000, yeah. That's on that first section.
"* * *
 {¶ 61} "A. I said anything you want to do is fine with me if I can afford it.
"* * *
 {¶ 62} "Q. All right. So J.M. had the power to do himself —
 {¶ 63} "A. Whatever he said was okay with me.
"* * *
 {¶ 64} "Q. All right. And do you — well, okay, he knew you could afford half the 140 so —
 {¶ 65} "A. No.
 {¶ 66} "Q. — did you intend —
 {¶ 67} "A. No, not half of 140. I come up with half — we both come up with half a 140. That would be seventy — 35 a piece. Doug May would take care of half and J.M. and I would take care of the other half.
 {¶ 68} "Q. Now what about the cost of trying to get this zoning and all, were you splitting the same way?
 {¶ 69} "A. I asked J.M. what it would cost to get it zoned and I think he said approximately $80,000. Of course, that would be split between — it would be a three way split I guess — no, it would be half Doug and half between me and J.M."
 {¶ 70} Legate stated in his answers to Dunaway's interrogatories that he was "involved with Mr. Mays and Mr. Patterson on the purchase of real estate from Thelma Dunaway." Legate stated that he was "involved with Mr. Patterson for approximately thirty years in the purchase and sale of real estate," and "[w]e are equally involved in the discussion of the purchase of the Dunaway farm."
 {¶ 71} John Patterson testified in his deposition as follows:
 {¶ 72} "Q. Now, were you partners with Doug Mays in trying to buy her property there?
 {¶ 73} "A. No.
 {¶ 74} "Q. You weren't?
 {¶ 75} "A. No.
 {¶ 76} "Q. What was your relationship with Doug Mays and John Legate with respect to Thelma Dunaway's property?
 {¶ 77} "A. Doug Mays bought. We was going to develop it.
 {¶ 78} "Q. Explain that.
 {¶ 79} "A. If Doug Mays got it rezoned, I was going to develop it.
· * * *
 {¶ 80} "Q. Did you make any payments to anybody with respect to the development or rezoning of Thelma Dunaway's farm?
 {¶ 81} "A. Yeah, I did.
 {¶ 82} "Q. Okay. What payments did you make?
 {¶ 83} "A. I made a payment to Thelma Dunaway, and I made several payments to the attorney that was trying to get it rezoned.
 {¶ 84} "Q. That's John Koverman?
 {¶ 85} "A. Yes.
· * * *
 {¶ 86} "Q. * * * * What do you remember about the time you made the payment to her?
 {¶ 87} "A. I gave a check to Doug Mays, and he took it to her in Richmond, Kentucky, I believe Richmond, where she lives at.
 {¶ 88} "Q. So you gave a check to Doug Mays to give to her. On what account was the check drawn?
 {¶ 89} "A. John Patterson and John Legate.
 {¶ 90} "Q. And were the — is that a checking account that you maintained for the partnership?
 {¶ 91} "A. Yes.
 {¶ 92} "Q. For properties that the 2 of you may own together?
 {¶ 93} "A. Yes.
 {¶ 94} "Q. How much was the check for?
 {¶ 95} "A. 10 thousand dollars.
 {¶ 96} "Q. What was the purpose of the check?
 {¶ 97} "A. It eventually was going to go toward the payment of the property, a payment to release some of it if the zoning changed.
· * * *
 {¶ 98} "Q. What was your agreement then in terms of sharing of the profits?
 {¶ 99} "A. Well, it would be — it would be a 3-way partnership.
 {¶ 100} "Q. A third, a third, a third?
 {¶ 101} "A. A third, a third, a third.
 {¶ 102} "Q. And would it be that way with the expenses of the rezoning as well?
 {¶ 103} "A. Sure.
 {¶ 104} "Q. And that would include the money that was spent on engineering work and site work?
 {¶ 105} "A. Sure.
 {¶ 106} "Q. Would also be the case with respect to the legal fees for the rezoning?
 {¶ 107} "A. Sure.
 {¶ 108} "Q. So no matter who was advancing the money, you were all going to split it a third, a third, a third?
 {¶ 109} "A. Right.
 {¶ 110} "Q. That was the agreement you had with yourself and John Legate and Doug Mays at the time you gave him your check for 10 thousand dollars?
 {¶ 111} "A. Right.
· * * *
 {¶ 112} "Q. * * * * [D]id you call [Dunaway]? * * * *
 {¶ 113} "A. Yes, I did.
 {¶ 114} "Q. What do you remember about that phone conversation?
 {¶ 115} "A. Just I called her, and I said, `Mrs. Dunaway, you know that you can't sell this property. You have already got a contract on it.'
 {¶ 116} "And she said, `Well, I have already got it sold.'
 {¶ 117} "The best I remember, I said, `Mrs. Dunaway, we have been out a lot of money on that, and we got a contract on it, and you cannot resell it. According to the law, you can't resell it.'
 {¶ 118} "She said, `The contract has expired. I didn't have no cont[r]act with nobody, and I already resold it.'
 {¶ 119} "Now, that's the best I remember.
 {¶ 120} "Q. Did you say anything to her? Did you tell her you had invested over a hundred thousand dollars in it?
 {¶ 121} "A. She said that. I don't know that I did. I wouldn't dispute it, because it's a possibility I said I spend a hundred thousand dollars on it, a possibility."
 {¶ 122} Patterson's deposition testimony is inconsistent with his affidavit, submitted in support of his motion for summary judgment, in which he avers that "[a]t the time that I discussed the pendency of Doug Mays real estate contract with Thelma Dunaway, my only comment to her was to remind her that she had a purchase contract with Doug Mays and that she must resolve the circumstances of that purchase contract before she entered any new contract." Patterson further stated in his affidavit that "[a]t no time during the aforementioned conversation did I threaten, coerce, or claim specific expenditures. . . ." Patterson also stated in his answers to Dunaway's interrogatories that he was "involved with Mr. Mays and Mr. Legate on the purchase of real estate from Thelma Dunaway." Patterson stated that he was "involved with Mr. Legate for a number of years in the purchase and sale of real estate," and "[w]e are equally involved in the discussion of the purchase of the Dunaway farm."
 {¶ 123} The inconsistencies between the deposition testimony of Dunaway, Mays, Legate, and Patterson and the affidavits of Mays, Legate, and Patterson, as well as the answers by Legate and Patterson to Dunaway's interrogatories, demonstrate that a genuine issue of material fact exists whether a partnership existed between Mays, Patterson, and Legate regarding the purchase of Dunaway's farm. Therefore, the trial court erred in rendering summary judgment in favor of Patterson and Legate. This cause will be remanded for further proceedings on Dunaway's third-party claims against Patterson and Legate.
 {¶ 124} Dunaway's Third Assignment of Error is sustained.
 IV {¶ 125} "Court erred when it failed to grant Mrs. Dunaway sanctions after repeated failure by appellees to comply with discovery and orders of the court."
 {¶ 126} Dunaway contends that the trial court erred in its failure to award reasonable expenses or to make a finding that non-compliance of orders by the trial court compelling discovery was substantially justified.
 {¶ 127} Civ.R. 37(A)(4) provides that if a motion for an order compelling discovery is granted, "the court shall, after opportunity for hearing, require the party or deponent who opposed the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust." Civ.R. 37(D) provides that where a party fails to attend his own deposition, serve answers to interrogatories, or respond to a request for inspection, and there is an order to do so, "the court shall require the party failing to act or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court expressly finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."
 {¶ 128} These "sanctions are not discretionary, but are mandated by the language of Civ.R. 37(D) itself." Soloman v. Excel Marketing, Inc.
(1996), 114 Ohio App.3d 20, 28, 682 N.E.2d 724. We have previously held that "[a]bsent an express finding that the failure to comply was substantially justified or that other circumstances would make an award unjust, the trial court must grant a party's request for reasonable expenses." Id. (citations omitted).
 {¶ 129} On October 23, 2002, the trial court granted in part Dunaway's motion to compel discovery and denied Dunaway's motion for sanctions. On April 2, 2003, the trial court also granted Dunaway's motion to compel discovery and denied Dunaway's motion for sanctions. In both orders, the trial court failed to make express findings that the failure to comply was substantially justified or that other circumstances would make an award unjust. Consequently, the trial court erred by not awarding Dunaway reasonable expenses. See Soloman, supra. This cause is remanded for consideration of Dunaway's request for reasonable expenses, including attorney's fees, as a result of Mays, Patterson, and Legate's failure to comply with discovery orders.
 {¶ 130} Dunaway also argues that she is entitled to recover expenses for Mays's and Legate's failure to attend mediation. Dunaway supports her contention with Montgomery County Local Rule 2.39(VI)(A), which provides, in pertinent part, that "[t]he parties shall attend all mediation sessions, unless their attendance has been excused by the Court Mediator. . . . Willful failure of a party to attend a mediation session shall be reported by the Court Mediator to the Assigned Judge who may impose appropriate sanctions."
 {¶ 131} The record does not demonstrate that the Court Mediator reported to the trial judge the willful failure of Mays or Legate to attend the mediation. Dunaway also concedes that the Court Reporter did not report that Mays and Legate were not at the mediation. It is undisputed that Patterson and two attorneys were present at the mediation, and that the Court Mediator was satisfied that they had authority to proceed. Therefore, the trial court did not err in overruling Dunaway's motion for sanctions, pursuant to Montgomery County Local Rule 2.39, for the failure of Mays and Legate to attend mediation.
 {¶ 132} Dunaway further contends that Mays, Patterson, and Legate should be precluded from asserting the attorney-client privilege regarding the testimony of John Koverman, the attorney involved in the zoning case, because the trial court's ruling on September 25, 2002, is dispositive of that issue. In September, 2002, Dunaway subpoenaed Koverman, and Mays, Patterson, and Legate moved to quash the subpoena, asserting the attorney-client privilege. On September 25, 2002, the trial court ordered Koverman to produce certain records.
 {¶ 133} In October, 2002, Dunaway subpoenaed Koverman to testify. The records from the trial court's September 25, 2002 order had been turned over to the trial court and given to the parties at the scheduled deposition of Koverman on October 24, 2002. The issue of attorney-client privilege arose again at the deposition, and the trial court then held a hearing. The trial court ruled that there was no attorney-client privilege and permitted the questioning of Koverman by Dunaway's attorney. Mays requested the trial court stay its order and make a finding of no just cause for delay, in order to allow him to appeal the decision. The next day, Dunaway withdrew her subpoena for the deposition of Koverman.
 {¶ 134} As the trial court ruled in favor of Dunaway, Dunaway does not assert any error to her prejudice by the trial court. Therefore, there is nothing before us to decide.
 {¶ 135} Dunaway's Fourth Assignment of Error is sustained in part and overruled in part.
 V {¶ 136} Dunaway's First, Second, and Third Assignments of Error having been sustained and Dunaway's Fourth Assignment of Error having been sustained in part and overruled in part, that part of the judgment of the trial court denying Dunaway's request for sanctions for failure to attend court-ordered mediation is affirmed, that part of the judgment of the trial court rendering summary judgment for Mays, Patterson and Legate on Mays's complaint against Dunaway and on Dunaway's counterclaim and third-party claims against Mays, Patterson and Legate is reversed, that part of the judgment of the trial court declining to award sanctions to Dunaway on her claim that other parties violated discovery orders is reversed, and this cause is remanded for further proceedings consistent with this opinion.
Young and Glasser, JJ., concur.
(Judge George M. Glasser, Retired from the Sixth Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).